Filed 5/14/15  P. v. Leyva CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040187 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. B1261636) |
| v. | |
| ELIAS EVERETT LEYVA, | |
| Defendant and Appellant. | |

Defendant Elias Everett Leyva invited a female coworker to his home for dinner on an evening when his wife and children were out of town.  He made unwanted sexual advances towards his coworker, which she eventually reported to police.  After a jury trial, defendant was convicted of one misdemeanor count of sexual battery (Pen. Code, §§ 242, 243.4, count 2).  The jury acquitted him of felony false imprisonment (Pen. Code, §§ 236, 237, count 1) and did not reach a verdict on the lesser included offense of misdemeanor false imprisonment.  The trial court declared a mistrial on the misdemeanor false imprisonment count.  At sentencing on the sexual battery conviction, the court granted probation on the condition defendant serve five months in jail.  It also ordered defendant to register as a sex offender.

On appeal, defendant challenges the trial court's in limine order denying his motion to exclude evidence of text messages of a sexual nature that he sent to another female coworker approximately three weeks before the events at issue in this case.  He

contends this evidence should have been excluded (1) under Evidence Code section 1101, subdivision (a) because it was inadmissible character evidence; and (2) under Evidence Code section 352 as unduly prejudicial. We conclude the trial court was aware of its discretion to admit or exclude this evidence, applied the correct legal analysis to the facts of this case, properly weighed the probative value of the evidence against its prejudicial effect, and did not abuse its discretion when it admitted the evidence regarding the text messages. We will therefore affirm the judgment.

## FACTS

### *Prosecution Case*

#### Victim's Testimony

In July 2012, Maria was living in Southern California. She was a member of the California Air National Guard (National Guard). One weekend a month, she traveled to Northern California for duty at Moffett Field as an aircraft hydraulics specialist.

Maria had known defendant since she joined the National Guard in 2009. He worked for the National Guard full time as an aircraft fuels specialist. Up until July 2012, Maria had a friendly, professional relationship with defendant. They did not have any conflicts in the workplace and he had never shown a sexual interest in her. She knew he was married and they never socialized outside of work.

Maria was at Moffett Field on Friday, July 20, 2012, for physical fitness testing. Around 1:30 p.m., defendant invited Maria and others for drinks after work at the golf course bar on base. Defendant offered to pick Maria up at her hotel and take her to the bar, but she declined because her hotel was close to the bar. Maria did not say whether she would attend. After work, Maria went to her hotel and fell asleep.

When Maria woke up around 5:30 p.m., she checked her cell phone and saw that defendant had called her twice. She called him back, apologized for not making it to the

2

bar, and told him she was going to get something to eat.  Defendant said he was grilling some food at home and invited Maria to come over.  Earlier in the day, she had overheard defendant say his wife and children were away, but it did not cross her mind that anything inappropriate would happen if she went to his home.

Maria went to the store; bought some vegetables, chicken, and steaks; and got to defendant's duplex in Sunnyvale a little after 7:00 p.m.  When she arrived, defendant was in his carport, drinking a beer.  When she entered the duplex, Maria noticed they were alone.  She was really hungry, so she cut up the vegetables, while he cooked the steaks.  Defendant twice offered her a beer, but she declined both times.  He also offered to go to the store and buy her some wine, but she declined that as well because she did not drink alcohol.

Shortly after her arrival, defendant told Maria he "wanted to get [her] alone."  She found that odd, but did not say anything.  After defendant finished grilling the steaks and vegetables, Maria was standing with her back to him in the kitchen, filling her plate, when he grabbed the right side of her "butt" with one hand.  She said, "What are you doing?" and swatted at his hand.  After that, Maria assumed he understood she did not want any sexual contact.  She told defendant she would sit in the kitchen and eat.  At that point, she had decided to eat and then leave.  But defendant insisted they go into the living room and watch a movie.  She assumed he would not do anything further, so she went into the living room.

Maria sat on a couch that was located across from the television.  She opened a bottle of cola, took a couple of sips, and placed it on the floor.  Defendant sat next to her.  As she was eating, defendant put his arm around her shoulders.  She "peeled" his arm off and asked, "What are you doing?" and "If your wife were to walk in here, what would she think?"  Defendant responded, "You should see my wife."

Defendant then reached around Maria's lower back, grabbed her right breast, her left breast, and her "vagina," over her clothes; it all happened really quickly.  He then

3

grabbed her jaw tightly with both hands, pushed her head toward the back of the couch, and tried to put his tongue in her mouth. Maria turned her head and defendant ended up licking her cheek. Defendant grabbed her by the shoulders and forced her onto her back, pinning her to the couch. She wanted to get away, but could not. He extended his arms and put all of his weight on her, as if doing a push-up on her shoulders. (Defendant was six feet two inches tall and weighed 211 pounds; Maria was five feet six inches tall and weighed 130 pounds.) Maria said, "Let me go" and "What are you doing?" She knew she "was in trouble" and feared she would be raped. All of a sudden, she heard a loud popping noise, which startled both of them. Apparently, her cola had exploded. She could not recall how that happened. Maria believed it was "a miracle." Defendant released her and she slid off the couch. She grabbed a towel, pretended to wipe up the spill, ran into the kitchen, grabbed her keys, and fled. She returned to her hotel.

Maria flew home the following day (Saturday, July 21, 2012). While at the airport, she called her friend, Leonard Lee, and told him what had happened. He said it was a "crime" or an "assault" (she could not recall which word he used). The next day, Maria went to a study session with her friend Blanca and told her what had happened. Blanca also said it was a crime. On Monday, July 23, 2012, Maria reported the incident by phone to the Sexual Assault Response Coordinator at Moffett Field. After she filed a written report, the coordinator told Maria he would not take any action because the incident occurred off base. The coordinator then referred Maria to the Sunnyvale Police Department.

### Testimony of Officer Meinhardt, Walter McCaffrey, & Leonard Lee

Sunnyvale Police Officer David Meinhardt investigated the case and arranged for Maria to make a pretext telephone call to defendant. Officer Meinhardt also took a recorded statement from defendant. At trial, the jury heard the recordings of both the pretext telephone call and defendant's recorded statement.

4

In the pretext telephone call, defendant admitted grabbing Maria's buttocks and putting his arm around her. He said he had too much to drink. But he stated that he did not recall grabbing her breasts or genitals, trying to kiss her, or pinning her on the couch. He apologized repeatedly and said he was "a drunk idiot."

In his recorded statement, defendant told Officer Meinhardt he had two pitchers of beer at the bar and two 40-ounce bottles of beer at home. He admitted "being flirtatious" with Maria, slapping her buttocks in the kitchen, and giving her a "hug and a feel" (which he said meant feeling her arms, shoulders, and leg). Later, he said he gave her two "tight squeeze hugs" and tried to kiss her. He said she smiled at him; he did not recall her telling him to stop.

Walter McCaffrey, who was a reservist with the National Guard, testified regarding conversations he had with both defendant and Maria regarding the incident. McCaffrey told the jury defendant admitted grabbing Maria's buttocks and "messing around" with her on the sofa. Leonard Lee, who was also with the National Guard, testified regarding his conversation with Maria the day after the incident.

**Testimony of Another Female Coworker**

Over defendant's objection, another female coworker, Jessica, testified regarding text messages of a sexual nature she had received from defendant prior to the incident involving Maria. Jessica had been in the National Guard since 2006. She met defendant in 2007, when they served in Afghanistan together. Defendant was a coworker and a friend and she had socialized with defendant and his wife. Jessica never dated defendant; there was never any sexual activity between them. She was not attracted to him and he never showed a sexual interest in her. They occasionally exchanged text messages.

On July 1, 2012, nineteen days before the incident with Maria, Jessica received a series of text messages from defendant over a 10-hour period. Some of the text messages were sexual in nature. At first, Jessica was not sure the messages were intended for her.

5

Later, she realized they were. She also became uncomfortable, since she "had a relationship with [defendant's] wife." When the text messages were being sent, defendant was in Lincoln, California, near Beale Air Force Base, which is north of Sacramento.

The text messages read as follows. Each entry is a separate text message. We have noted the location of one of two text messages the trial court redacted. It is not clear from the record where the other message was located. We will also note the times that each string of text messages started in brackets before the first message in the string. Finally, we will repeat the messages exactly as they appeared on the exhibit presented at trial, without noting grammatical and spelling errors.

"[DEFENDANT:] [No time stamp on exhibit.] Swimming?

"[DEFENDANT:] Let me know when the fb is at beale"

At first, Jessica did not know what "fb" meant; later defendant told her it meant "fuck buddy." The messages continued:

"[JESSICA:] Huh? I'm at music in the park… Who are you talking to?

"[DEFENDANT:] [5:37 p.m.] Fag breath whats up

"[JESSICA:] Haha… Nonsense!

"[DEFENDANT:] Your hair looks very nice

"[JESSICA:] When did you see my hair?

"[DEFENDANT:] Today

"[DEFENDANT:] Whatevet

"[JESSICA:] Huh??? Who are you talking to??!

"[DEFENDANT:] U carnalita

"[JESSICA:] No

"[DEFENDANT:] Your the fb

"[JESSICA:] The what?!

"[DEFENDANT:] F_ buddy

6

"[JESSICA:]  Huh?!

"[DEFENDANT:]  Whatevers, you little turkey."

At this point, Jessica knew the text messages were for her since defendant called her "Turkey" as a nickname.  She thought defendant was joking and tried "to brush it off as if it was nothing."  The messages continued:

"[JESSICA:]  Haha…  Are you still at Moffett?

"[DEFENDANT:]  No beale afb linclon ca

"[JESSICA:]  Wow!!  I'm still not cleared for duty

"[DEFENDANT:]  Good come have a brewsky, I wont tell no one

"[JESSICA:]  Where?!

"[DEFENDANT:]  Holiday inn lincoln ca

"[DEFENDANT:]  [two messages with hotel address, phone & room numbers]

"[DEFENDANT:]  ?

"[JESSICA:]  I'm in Los Gatos!

"[DEFENDANT:]  Smoove

"[DEFENDANT:]  Your hair looks sooooo pretty

"[JESSICA:]  What?!

"[DEFENDANT:]  Your hair looks soooo pretty like you

"[DEFENDANT:]  [6:15 p.m.]  I got a twin sized queen bed you can crash on

"[DEFENDANT:]  Well?

"[JESSICA:]  Where's your wife?  And that's wicked far

"[DEFENDANT:]  In los angeles an its only like 2 hours

"[DEFENDANT:]  [6:30 p.m.]  Wifes in los angeles an only 2hour drive

"[DEFENDANT:]  Weak sauce, fb

"[DEFENDANT:]  Yout my favorite little turkey

"[DEFENDANT:]  You rollin or what?

"[DEFENDANT:]  You sooooooi pretty

7

"[DEFENDANT:]  [7:30 p.m.] Yes, no, maybe?????/

"[DEFENDANT:]  Call me

"[DEFENDANT:]  [8:15 p.m.]  Did you fall asleep?

"[DEFENDANT:]  [8:32 p.m.]  Where?

"[DEFENDANT:]  You little turkey you can at least text me if your rollin or not.

"[DEFENDANT:]  [8:53 p.m.]  Your soooooo pretty

"[DEFENDANT:]  At least say if ur coming or not, you mean lady

"[JESSICA:]  [9:18 p.m.]  I said no earlier…  I just went for a run

"[DEFENDANT:]  Are u rollin tomorrow?

"[JESSICA:]  No…  Why?

"[DEFENDANT:]  Whatever, thought we would cuddle, fb

"[DEFENDANT:]  Your hair looks sooo pretty an I know therw extensions

"[JESSICA:]  You're married…  And stop calling me FB…

"[DEFENDANT:]  OK cool

"[DEFENDANT:]  [9:34 p.m.]  Well good night an if I ever get divorced, im taking u out

[Trial court redacted next text message from defendant.]

"[JESSICA:]  Good night weirdo

"[DEFENDANT:]  [9:45 p.m.]  You look hot with your new hairdew, not that I noticed, someone told me

"[JESSICA:]  Who?!  And from where?

"[DEFENDANT:]  Yeah you are soooo pretty and sexy an I can only wish that I had abeutiful wife like you

"[DEFENDANT:]  If I ever get divorced I want to marry you next

"[DEFENDANT:]  OK, go to sleep my love

"[DEFENDANT:]  [10:00 p.m.]  I want to FUCK you like an animal, nine inch nails song

"[DEFENDANT:] Just to let you know after you broke my heart, I think your the most beautiful girl in the whole wide world

"[JESSICA:] Stop… This is not cool!! I don't know where this is coming from but please stop.

"[DEFENDANT:] [10:15 p.m.] I will never figet you, cause, who loves you

"[DEFENDANT:] I'm just dribking expressin my feelings

"[DEFENDANT:] Whatever chucacabra you know you want to be held

"[JESSICA:] I'm seeing someone and so are you… We were buds but I can't do this

"[DEFENDANT:] I love you

"[DEFENDANT:] I wish I was the one you are seeing baby doll

"[DEFENDANT:] Your a sexy little turkey

"[DEFENDANT:] OK, my heart is broke

"[JESSICA:] I like your wife… She wouldn't be happy about this!

"[DEFENDANT:] [10:30 p.m.] Whatevers, you think she cares when she is in la partying?

"[DEFENDANT:] Omg I express my feelings toward you. Keep it in the low low."

Jessica understood "keep it in the low-low" to mean do "not tell anybody." These messages followed:

"[DEFENDANT:] I love you

"[DEFENDANT:] [10:45 p.m.] In another life my beutiful pruncess

"[DEFENDANT:] In a nother time my beutiful girl

"[DEFENDANT:] I want to lick you and your sexy

"[JESSICA:] Stop! Don't text me anymore!

"[DEFENDANT:] [11:00 p.m.] I want to lick you

"[DEFENDANT:] OK sorry"

9

The next day, Jessica received the following text message from defendant at 6:21 a.m.: "Hella drunk yesterday"

*Defense Case*

Defendant did not testify. His wife testified regarding the layout of their home and authenticated photos of their living room.

**PROCEDURAL HISTORY**

Defendant was originally charged by complaint with one count of felony false imprisonment (Pen. Code, §§ 236, 237, count 1) and one count of misdemeanor sexual battery (Pen. Code, §§ 242, 243.4, count 2). After a preliminary examination, defendant was held to answer on both counts and the prosecution filed an information that charged defendant with these same offenses.

The case was tried to a jury over seven days. The jury started deliberating in the afternoon of the fifth day; deliberations lasted a little over two days, and took 13 to 14 hours to complete. The jury convicted defendant of misdemeanor sexual battery (Pen. Code, §§ 242, 243.4, count 2), acquitted him of felony false imprisonment (Pen. Code, §§ 236, 237, count 1), and did not reach a verdict on the lesser included offense of misdemeanor false imprisonment. The court declared a mistrial on the misdemeanor false imprisonment offense.

At sentencing, the probation officer reported that as a result of his conviction in this case, defendant was terminated from his position with the National Guard. The National Guard was also investigating defendant for sexual harassment regarding the "sexting" of Jessica. Defendant subsequently obtained employment with the Great America amusement park as a ride operator, earning $22.50 per hour. Defendant's criminal history included a 2001 conviction for misdemeanor driving under the influence. He was also arrested for driving under the influence in Idaho in 2007. Attached to the

10

probation report were three letters of support attesting to defendant's good moral character.

The court suspended imposition of sentence and granted probation on the sexual battery count. As conditions of probation, the court ordered defendant to serve five months in jail, not to possess or use alcohol, and to complete a substance abuse program. The court imposed a number of other conditions of probation not at issue in this appeal, and it ordered the imposition of certain fines and fees. The court also ordered defendant to register as a sex offender (Pen. Code, § 290). The prosecution elected not to retry the lesser-included, misdemeanor false imprisonment count, so that count was dismissed.

## DISCUSSION

Defendant contends the court erred in admitting Jessica's testimony regarding her text message exchange with defendant on July 1, 2012. He argues her testimony was inadmissible character evidence that should have been excluded under Evidence Code section 1101, subdivision (a). (All further unspecified statutory references are to the Evidence Code.) Alternatively, defendant contends the court erred because Jessica's testimony was unduly prejudicial and should have been excluded under section 352. He argues these errors were prejudicial under state law and that it is reasonably probable the jury would have reached a more favorable result in the absence of these errors. (*People v. Watson* (1956) 46 Cal.2d 818, 836-837.) The Attorney General argues the trial court acted within its discretion because the evidence was admissible under section 1101, subdivision (b) to prove intent and was not unduly prejudicial under section 352.

11

*Background*

**Motions in Limine**

Both parties made motions in limine concerning Jessica's testimony about the text messages she received from defendant prior to the incident involving Maria. A description of these motions follows.

The prosecution moved to admit evidence of the "sexually harassing text messages" under Evidence Code section 1101, subdivision (b) as proof of defendant's sexual intent and the absence of mistake about the victim's lack of consent on the sexual battery count. The prosecution argued that defendant had placed (1) the specific intent required to prove sexual battery—that the touching "was done for the specific purpose of sexual arousal, sexual gratification, or sexual abuse—and (2) his "knowledge of non-consent" at issue when he pleaded not guilty and that his prior conduct with Jessica was sufficiently similar and relevant to show both his present intent and that he knew he lacked the victim's consent. The prosecution further argued that the evidence was not made inadmissible under section 352 because its probative value was not substantially outweighed by the danger of undue prejudice.

Defendant moved to exclude Jessica's testimony on the grounds that it constituted inadmissible character evidence under section 1101, subdivision (a) and was unduly prejudicial under section 352. He argued this evidence was not made admissible under the "common plan" exception in section 1101, subdivision (b) since a high degree of similarity is required to show a common plan and defendant's conduct with Jessica was not sufficiently similar to his conduct with Maria to demonstrate a common plan. Defendant also argued the evidence was inadmissible under section 352 because it was "extraordinarily prejudicial," had "limited, if any probative value," and would require an undue consumption of time.

**Trial Court Order on Motions in Limine**

After redacting two lines that used the term "rape" from the text messages, the court granted the prosecution's motion and denied defendant's motion. The trial court found "the prior text messages did have substantial probative value" and "there [were] a number of similarities between those text messages exchanges and the current crime." In particular, the court found: (1) both incidents involved coworkers with whom defendant "had not had any type of sexual or romantic relationship or expressed interest," (2) the exchange with Jessica occurred only 19 days before the assault of Maria, (3) defendant had invited both women for drinks, (4) defendant told Jessica "he wanted sex despite being married," (5) defendant "persisted with his sexual request and comments despite being clear that [Jessica] was not consenting and [had] asked him to stop," and (6) the next day defendant claimed to be drunk and used it as an excuse for his conduct. The court observed that the issues of sexual intent and absence of mistake regarding the victim's consent were key issues in this case. The court found that Jessica's testimony had "substantial probative value," which was not outweighed by its prejudicial effect. And to "eliminate" any prejudicial effect of this evidence, the court ordered two of defendant's messages redacted from the text message exchange. First, the court redacted defendant's text message that followed the line "and if I ever get divorced, I'm takin you out," which said: "And rape you. Ha. With hostile Haabed." Second, the court redacted a message from defendant that stated: "Yep. Why you think you would get raped little girl." The court also considered that the text messages to Jessica did not result in a conviction or even constitute a crime, and that use of them as evidence was not stronger or more inflammatory than the evidence of the charged offenses. The court said it admitted the text messages "for the limited purpose of showing defendant's sexual intent and absence of mistake about the victim's consent for the charge of sexual battery."

**Jury Instruction Regarding Limited Purpose of This Evidence**

The court instructed the jury regarding the limited purpose of the evidence at issue with CALCRIM No. 375, as follows: "The People presented evidence of other behavior by the defendant that was not charged in this case, namely, the text messages exchanged with Jessica . . . . [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed these acts. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the acts, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] [t]he defendant acted with the intent to achieve sexual arousal, sexual gratification, or sexual abuse when he allegedly touched [Maria's] intimate parts; or [¶] [t]he defendant knew that Maria . . . did not consent [to] his touching of her intimate parts when he allegedly acted in this case. [¶] In evaluating this evidence consider the similarity or lack of similarity between the acts and the charged offense. [¶] Do not consider this evidence for any other purpose. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] If you conclude that the defendant committed the acts, that conclusion is only one factor to consider along with all of the other evidence. It is not sufficient by itself to prove that the defendant is guilty of sexual battery. The People must still prove the charge beyond a reasonable doubt."

*Legal Principles*

" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or

14

disprove any disputed fact that is of consequence to the determination of the action." (§ 210.)  But there are some limitations to the admission of relevant evidence.  A theory of relevance that depends on a defendant's character traits or propensity to engage in certain conduct, for example, is generally impermissible.  Under section 1101, subdivision (a), "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

"Although evidence of prior [bad] acts generally is inadmissible to show bad character, criminal disposition, or probability of guilt, such evidence may be admissible when relevant to prove some material fact other than the defendant's general disposition to commit such an act."  (*People v. Jones* (2012) 54 Cal.4th 1, 49, citing section 1101, subd. (b).)  Under subdivision (b) of section 1101, evidence of the defendant's prior conduct is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."  (§ 1101, subd. (b).)  "[I]t is the prosecutor's burden at trial to prove a defendant's prior misconduct by a preponderance of the evidence."  (*People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1444.)

Under section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (§ 352.)  "When evidence of prior offenses is presented to a jury, there is inherent danger of prejudice to an accused.  Therefore, such evidence should be received with caution and admitted only

15

when its probative value outweighs its prejudicial effect." (*People v. Evers* (1992) 10 Cal.App.4th 588, 599.)

### Standard of Review

"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.) "A trial court has broad discretion in determining whether to admit or exclude evidence objected to on the basis of section 352 [citation], and rulings under that section will not be overturned absent an abuse of that discretion [citation]. '[T]he term judicial discretion "implies absence of arbitrary determination, capricious disposition or whimsical thinking." ' [Citation.] '[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered.' [Citation.]" (*People v. Mullens* (2004) 119 Cal.App.4th 648, 658.)

### The Trial Court Did Not Abuse its Discretion When it Admitted the Testimony Regarding the Text Messages

Under the express terms of section 1101, subdivision (b), evidence of prior bad acts may be relevant to prove intent or absence of mistake, and such evidence is not prohibited if offered for those purposes. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*), superseded by statute on other grounds, as stated by *People v. Britt* (2002) 104 Cal.App.4th 500, 505.)

In *Ewoldt*, the California Supreme Court examined three categories of evidence admissible under section 1101, subdivision (b) and distinguished "the nature and degree of similarity (between uncharged misconduct and the charged offense) required . . . to establish a common design or plan, from the degree of similarity necessary to prove intent or identity." (*Ewoldt*, *supra*, 7 Cal.4th at pp. 402-403.) The court explained: "The least degree of similarity (between the uncharged act and the charged offense) is required

in order to prove intent.  [Citation.]  '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .'  [Citation.]  In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]"  (*Id.* at p. 402.)  "A greater degree of similarity is required . . . to prove the existence of a common design or plan" and the "greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity."  (*Id.* at pp. 402-403.)

In this case, the similarity between defendant's uncharged conduct ("sexting" Jessica) and the charged offense (the sexual battery of Maria) is sufficient to meet the test for admissibility from *Ewoldt* for the purpose of showing defendant's intent.  As the trial court stated:  (1) both incidents involved female coworkers with whom defendant "had not had any type of sexual or romantic relationship or expressed interest"; (2) the events occurred very close in time to one another, only 19 days apart; (3) defendant had invited both women for drinks; (4) defendant made sexual advances towards both women despite being married; (5) defendant "persisted with his sexual requests" after the women indicated they were not consenting and asked him to stop; and (6) the day after each encounter, defendant claimed to be drunk and used it as an excuse for his conduct. Defendant's intent and the absence of mistake regarding Maria's consent were key issues in this case.  Moreover, "it was the *combination of similar factors*" that rendered this evidence admissible.  (See e.g., *People v. Rogers* (2013) 57 Cal.4th 296, 328, original italics.)

Defendant argues that his conduct with Jessica was not sufficiently similar to the sexual battery of Maria because it did not involve the touching of an intimate body part since he was over one hundred miles away in a different city.  But contrary to defendant's

17

assertions, the text messages reveal an intent to touch Jessica to achieve sexual gratification. He expressly stated that he wanted to "cuddle" her, "hold" her, "lick" her, and "FUCK" her. He provided her with the name, address, and phone number of his hotel, as well as his room number, and he asked her several times whether she was "rollin"—which we understand to mean whether she was on her way—and later asked whether she was coming or not.

Defendant's reliance on *People v. King* (2010) 183 Cal.App.4th 1281 is misplaced. In *King*, the court concluded there were significant dissimilarities between the defendant police officer's uncharged conduct toward a person named Regina (asking her about "blow jobs" and to show him her belly button ring, but no physical contact) and the charged conduct involving a person named Nicole (fondling her breasts and digitally penetrating her vagina twice during a purported search for drugs and weapons). The court observed that Regina was well known to defendant, while Nicole was a total stranger. The court concluded that the defendant's "arguably threatening, sexually offensive and boorish behavior" toward Regina "could also be interpreted as a wholly inappropriate and misguided attempt to initiate a relationship with her" and was "subject to at least one reasonable interpretation that [did] not involve immediate sexual arousal." (*Id.* at p. 1302 and fn. 11.) Here, in contrast, both women were well known to defendant. They were his coworkers. And the conduct involving Jessica is not subject to an interpretation that does not involve a sexual intent.

With respect to Evidence Code section 352, we agree with the trial court that the substantial probative value of the evidence regarding the text messages was not outweighed by the likelihood it would prejudice the jury. (*Ewoldt*, *supra*, 7 Cal.4th at pp. 404-407.) The court said it admitted the text messages "for the limited purpose of showing defendant's sexual intent and absence of mistake about the victim's consent for the charge of sexual battery." Evidence regarding the text messages was probative on the question whether defendant had the intent required to prove a sexual battery. The source

18

of information—Jessica—was independent from Maria. The uncharged conduct (sexting) was no more serious or inflammatory than the charged offense (sexual battery). As the trial court noted, sexting is not a crime. Thus, there was little risk the jury would attempt to punish defendant for his conduct with Jessica. Nor were the acts involving Jessica too remote in time—there were only 19 days between the time defendant sent the text messages to Jessica and his assault of Maria. (See, e.g., *Jones*, *supra*, 54 Cal.4th at p. 51 and cases cited therein.) Jessica's testimony was the only evidence of uncharged acts admitted in the case and she was only on the stand for 53 minutes, which is not an "undue consumption of time" (§ 352). Furthermore, the limiting instruction the court gave to the jury (CALCRIM No. 375) ensured the evidence of the text messages would not be considered for an improper purpose. Absent a showing to the contrary, we presume the jury followed the court's instructions.

Given the highly probative nature of Jessica's testimony as to intent, we conclude the trial court acted within its discretion in finding the evidence regarding the text messages sent to Jessica substantially more probative than prejudicial. None of defendant's arguments diminishes the probative value of Jessica's testimony. Accordingly, the trial court did not abuse its discretion by admitting the evidence under section 1101, subdivision (b) and section 352.

## DISPOSITION

The judgment is affirmed.

_____
Márquez, J.

WE CONCUR:

_____
Rushing, P. J.

_____
Elia, J.