Filed 12/30/21  P. v. Hamilton CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>ERIC HAMILTON,<br><br>        Defendant and Appellant. | A160012<br><br>(San Mateo County<br>Super. Ct. No. 19NF010941A) |

Defendant Eric Hamilton was convicted in a bench trial of two counts of second degree robbery, both accompanied by an enhancement for a principal being armed with a firearm.  He was sentenced to four years in prison.  On appeal, Hamilton claims that (1) insufficient evidence supports the convictions; (2) the trial court erred by admitting evidence generated by a computer program, Cell Hawk, that maps cell phone data; and (3) remand is required for a hearing on his ability to pay various fines and fees.  We are not persuaded by any of these claims, although the amount of one of the fees imposed is incorrect.  Therefore, we modify the judgment to correct this error and affirm as modified.

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of March 31, 2019, A.P. and her husband won about $2,000 at the Lytton Casino in San Pablo (Lytton casino). Around 5:45 p.m., they left the casino in their car to return home. About an hour later, still on their way back home, they stopped at a Walgreens on Westborough Avenue in South San Francisco.

A.P., who was driving, testified that after she parked in the Walgreens parking lot, she and her husband remained inside the car, talking. A Black man with "braided hair," later identified as James Brisker, opened the driver's door, pointed a gun at her head, and told her, "Give me all your money." A.P. glanced into the back seat, where she had left her purse, and saw that it was gone.

A.P. got out of her car and saw another man, later identified as Jaymon Matthews, standing behind Brisker. As she was "yelling and crying," Brisker grabbed her hand, "pulled [her] up[,] and shoved [her]" to the ground. Brisker then approached A.P.'s husband, pointed a gun at him, and demanded his money. A.P.'s husband handed over about $400 in cash that he was carrying.

A coworker of A.P.'s happened to be in the Walgreens parking lot at the same time and saw Brisker "dragging [A.P.] onto the ground." The coworker also noticed Matthews standing by Brisker. The coworker testified that both men then entered a "running vehicle," and she took a photograph of it as it left the parking lot onto Westborough Avenue. Another bystander called 911 at 6:46 p.m., and A.P.'s coworker provided the fleeing car's license plate number to the dispatcher.

2

At approximately 7:00 p.m., a dispatch about the robberies issued describing the fleeing vehicle as a Nissan Altima.  Five minutes later, at 7:05 p.m., a Daly City police officer spotted the Nissan on the John Daly Boulevard on-ramp to Highway 280 and began following it.[1]  The officer kept the Nissan within his sight until California Highway Patrol officers stopped it in San Francisco.  The Nissan did not "take any evasive action" after the stop was initiated.

When the Nissan was pulled over, Hamilton was in the driver's seat, Brisker was in the front passenger's seat, and Matthews was in the back seat.  A cell phone belonging to Matthews was between the driver's seat and the center console.  A red-and-black jacket and A.P.'s driver's license were on the front passenger's seat, and her purse was in the back seat.  There was also a handgun under the front passenger's seat.  Finally, A.P.'s wallet and cell phone were found under the car's rear bench seat.

A Walgreens surveillance recording played at trial showed two people exit the Nissan from the driver's seat and front passenger's seat around the time of the robberies.  South San Francisco Police Detective Richard Amador described the recording, which is not in the record before us, as then showing a person wearing a red-and-black jacket climbing from the Nissan's back seat into the driver's seat.  It is uncontested that this person then drove the car away from the scene.

On the day of the robberies, a license plate reader recorded the Nissan traveling westbound on San Pablo Dam Road in San Pablo at 5:25 p.m. and eastbound at the same location at 5:54 p.m.  As we discuss further below,

---

[1] The officer testified that in moderate traffic, the drive from the Walgreens to the on-ramp where he first saw the Nissan is "approximately 14 minutes and 30 seconds."

Detective Amador testified that cell phone records showed that the phone of Matthews's discovered in the Nissan traveled that afternoon from Vallejo, where Matthews, Brisker, and Hamilton all lived, to the Lytton casino, where it arrived around 5:45 p.m. The records showed that the phone then traveled to San Francisco, with the last data point showing it was about eight miles from the Walgreens at 6:36 p.m., approximately 10 minutes before the robberies.

Hamilton was charged with two counts of second degree robbery, each with an accompanying allegation that a principal was armed with a firearm. He was also alleged to be ineligible for probation based on three prior felony convictions.[2] A charge of possession of a firearm by a felon and an allegation that the offenses were committed while Hamilton was on probation were dismissed on the People's motion at the trial's outset.

The trial court found Hamilton guilty of both robbery counts and found true the accompanying enhancements. The court found that Hamilton was the person who got into the Nissan's driver's seat and drove it away from the scene. Although acknowledging there was a 20-minute period between when the Nissan left the Walgreens and police spotted it, the court determined it was "purely speculative . . . to suggest there was someone else involved in this." Specifically, there was "no indication" that the Nissan's occupants had changed in this period, and Hamilton was "found in the car with stolen property and the other two people."

---

[2] The robbery charges were brought under Penal Code section 212.5, subdivision (c), and the firearm enhancements were alleged under Penal Code section 12022, subdivision (a)(1). The prior-conviction allegation was made under Penal Code section 1203, subdivision (e)(4), based on 2006, 2012, and 2016 convictions for firearm-possession offenses. All further statutory references are to the Penal Code unless otherwise noted.

After finding that Hamilton was ineligible for probation based on his prior convictions, the trial court sentenced him to a total term of four years in prison. The sentence was composed of the midterm of three years on one robbery count, a consecutive term of one year for the accompanying arming enhancement, and concurrent terms of three years for the other robbery count and one year for the other arming enhancement.[3] The court also imposed a $330 restitution fine, a $300 parole revocation fine, an $80 court operations assessment, and a $50 court facilities assessment.

## II.
### DISCUSSION

*A.      Sufficient Evidence Supports Hamilton's Convictions.*

Hamilton claims that his convictions must be reversed because there was insufficient evidence that he was the getaway driver, given the period of time between when the Nissan left the scene and when it was spotted by police. We are not persuaded.

To evaluate this claim, " 'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [fact finder] could reasonably have deduced from the evidence.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) Under this standard,

---

[3] The abstract of judgment omits the concurrent one-year term for the arming enhancement attached to the second robbery conviction. We order the abstract of judgment amended to include it.

5

reversal " ' "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*Ibid.*)

Relying on this division's decision in *People v. Sanford* (2017) 11 Cal.App.5th 84 (*Sanford*), Hamilton argues that it was not reasonable to infer that he was in the Nissan when it left the Walgreens. In *Sanford*, a group of five or six men robbed a jewelry store and escaped in two cars, driven by two additional men. (*Id.* at pp. 86–88, 94.) One of the cars, a Dodge Magnum, was spotted by police on the freeway about 10 minutes later. (*Id.* at pp. 88–89.) When the Magnum was pulled over, it had three people inside it, including the defendant. (*Id.* at p. 90.) Although substantial evidence supported the conclusion that there were three people in the Magnum when it left the scene, we concluded it was nonetheless unreasonable to infer that the same three people were in it when it was pulled over. (*Id.* at p. 94.) Our conclusion was supported by "uncontroverted evidence" that the original driver of the Magnum was not in the car when it was pulled over, as neither the defendant nor the other two men "came close" to fitting the only witness description of the driver. (*Ibid.*) Moreover, none of the stolen items or disguises and weapons the robbers used were in the car, "further suggest[ing] that [it] stopped for some reason between the scene and the freeway." (*Ibid.*) And finally, there was no physical evidence tying the defendant to the jewelry store. (*Id.* at p. 92.) Under the "unusual circumstances" presented, we reversed the defendant's robbery conviction for insufficient evidence. (*Id.* at p. 86.)

Hamilton argues that there is likewise an "insufficient reasonable basis to assume" he was in the Nissan when the robberies occurred. He points out that 20 minutes passed between when the Nissan left the scene and police

6

spotted it, "at least some of [which] was on surface streets where occupants could have changed." He also claims that there was no evidence linking him to the red-and-black jacket that was presumably worn by the person recorded getting into the driver's seat. Finally, he asserts that "[t]here was no evidence showing how many people were in the vehicle before and during the robber[ies]," as the trial court found merely that there was no "*affirmative* evidence" that more than three people were in the Nissan.

The key difference between this case and *Sanford* is that nothing here suggests that the occupants of the getaway car changed between when it left the scene and when it was spotted by police. In *Sanford*, the description of the person driving the Magnum when it left the scene did not match the description of any of the Magnum's occupants when it was spotted. (*Sanford*, *supra*, 11 Cal.App.5th at p. 94.) Here, in contrast, witnesses identified Brisker and Matthews as the two people who got out of and back into the Nissan in the Walgreens parking lot, and the surveillance recording showed that a third person remained in the car and moved to the driver's seat. The third person appeared to be wearing the same jacket that was found in the Nissan after it was stopped. Moreover, A.P.'s stolen items were also in the Nissan, and there was no evidence otherwise suggesting that the car stopped between when it left the Walgreens and when police located it. Thus, while it was *possible* that Hamilton got into the Nissan at some point during that 20-minute period, nothing in the record undermines the reasonable inference that the three people in the car when it was stopped were the same, and only, people in the car when it left the Walgreens. In turn, it was reasonable to infer that Hamilton was the person recorded getting into the driver's seat, as that person could not have been either Brisker or Matthews.

In short, *Sanford* does not support Hamilton's claim, and Hamilton does not provide any other authority suggesting there was insufficient evidence that he was driving the Nissan when it left the Walgreens. Ample, and certainly substantial, evidence supports the robbery convictions.

B.    *Hamilton's Challenge to the Cell Hawk Evidence Fails.*

Hamilton also claims the trial court erred by admitting evidence generated by Cell Hawk, the computer program Detective Amador used to map the locations of Matthews's cell phone at various times. Hamilton claims the evidence "was neither the opinion of an expert nor matter properly relied on by an expert in forming an opinion," and no foundation was laid "as to [the program's] function or reliability." We conclude that any error in the admission of this evidence was harmless.

1.    Additional facts

Detective Amador testified that he obtained records for Matthews's cell phone from Matthews's service provider. The records contained information such as the date and time that calls and text messages were sent and received by the phone, as well as "the coordinates of the cell towers that they use during the transmission of the call[s] or text messages." The detective explained that such data provides "a general idea of where the phone was" when it was used but "not the exact location." The cell phone records were admitted into evidence.

Detective Amador also testified that he input the data from the cell phone records into "a program called Cell Hawk, which is used to map[,] analyze[,] and visually display call detail records from telephone subscribers." The detective identified the lines of data that pertained to the day of the robbery and explained that if "given the time," he could tie every point plotted on the map generated by Cell Hawk to a particular line in the records.

8

He acknowledged that he had not in fact compared the map points and the cell phone data to "see if they match[ed] up," although it was possible to click on each point and see which data it referred to in the records.

The defense objected that evidence generated by Cell Hawk lacked foundation. Hamilton's trial counsel stated, "I [k]now how to use a computer. That doesn't make me an expert on how a computer works and what . . . information you get out of it." Counsel further argued that the program's accuracy had not been verified and Detective Amador was "not the appropriate witness to do that."

The trial court overruled the objection. Citing Detective Amador's training and finding that Cell Hawk is "a tool that is used by law enforcement that has sufficient reliability," the court concluded the challenged evidence had "a sufficient foundational basis." The prosecutor published screenshots of the map generated by the program and questioned Detective Amador about them, establishing, as set forth above, that before the robberies Matthews's cell phone traveled from Vallejo to the Lytton casino to San Francisco. The screenshots were also admitted into evidence.

     2.    Analysis

Hamilton claims that his convictions must be reversed because the trial court erred in admitting the evidence generated by Cell Hawk. We review the court's evidentiary rulings for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)

Hamilton argues at length that the Cell Hawk evidence was not admissible under Evidence Code sections 801 and 802 as "either expert opinion testimony" or "material supporting an expert opinion," since "there was no expert opinion here." It is true that Detective Amador was never qualified as an expert, but Hamilton did not object to the challenged evidence

9

on that basis. Thus, to the extent Hamilton now argues that the evidence was inadmissible because the detective was not qualified as an expert, we agree with the Attorney General that the contention is forfeited. (See *People v. Brown* (2014) 59 Cal.4th 86, 99 & fn. 8.)

Hamilton also argues that the Cell Hawk evidence was not "admissible on its own" under Evidence Code section 1552. That statute provides that "[a] printed representation of computer information or a computer program is presumed to be an accurate representation of the computer information or computer program that it purports to represent. This presumption is a presumption affecting the burden of producing evidence." (Evid. Code, § 1552, subd. (a).) If a party opposing the admission of such evidence "introduces evidence that [the] printed representation . . . is inaccurate or unreliable," the burden shifts to the party introducing the evidence to prove that the printed representation is accurate. (*Ibid.*)

As our state Supreme Court has affirmed, the presumption under Evidence Code section 1552 "essentially operate[s] to establish that 'a computer's print function has worked properly.'" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 269, quoting *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1450.) It "does not operate to establish the accuracy or reliability of the printed information. On that threshold issue, upon objection the proponent of the evidence must offer foundational evidence that the computer was operating properly." (*Hawkins*, at p. 1450.)

Hamilton argues that such foundational evidence was missing here, as "Detective Amador did not independently verify any of the result[s] he got from Cell Hawk," and there was no evidence about any past police use of the program to demonstrate it was reliable. But even if further foundation testimony was needed to establish the program's reliability, Hamilton fails to

10

demonstrate any prejudice resulted. Crucially, the cell phone records were also admitted, yet Hamilton makes no attempt to show that the points mapped in the Cell Hawk screenshots did not match or could not otherwise be derived from those records. Neither the screenshots nor the cell phone records are in the record before us, and we are therefore unable to determine for ourselves whether there are discrepancies. For the same reason, we cannot evaluate whether the trial court might have reached a different result had it been required to rely on the cell phone records only instead of the screenshots. And finally, other evidence also suggested that the Nissan followed A.P.'s car from the Lytton casino to the Walgreens, including the information from license plate readers and A.P.'s testimony about the timing of her trip and the robberies. As a result, we conclude that there is no reasonable probability that the verdict would have been more favorable had the Cell Hawk evidence been excluded. (*People v. Fuiava* (2012) 53 Cal.4th 622, 671; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

C. *Hamilton Forfeited His Ability-to-pay Claim.*

Lastly, Hamilton claims that the trial court imposed fines and fees without determining his ability to pay, in violation of the federal and state constitutional prohibitions of excessive fines. He relies on *People v. Cowan* (2020) 47 Cal.App.5th 52, review granted June 17, 2020, S261952 (*Cowan*), which was decided shortly after he was sentenced in February 2020. We conclude that he forfeited the claim by failing to object below. We also correct an error in one of the fees and direct that the abstract of judgment be amended to reflect the accurate fee amounts.

The trial court imposed the following fines and fees: (1) a $330 restitution fine under section 1202.4, reflecting the $300 minimum fine under subdivision (b) of that statute plus a 10 percent collection fee under

11

subdivision (*l*); (2) a $300 parole revocation fine under section 1202.45, which was stayed; (3) an $80 court operations assessment under section 1465.8; and (4) a $50 court facilities assessment under Government Code section 70373.[4] Hamilton did not object to these charges.

By statute, the minimum fines and the assessments imposed here are not subject to a defendant's ability to pay.[5] In *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Division Seven of the Second District Court of Appeal held that "due process of law requires [a] trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes [the two assessments at issue here]." (*Id.* at p. 1164.) *Dueñas* also held that while "section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the [restitution fine] over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid.*)

*Cowan*, a decision by Division Four of this court, held that "upon proper objection, a sentencing court must allow a defendant facing imposition of a minimum restitution fine or court operations and court facilities assessments an opportunity to present evidence and argument why these financial

---

[4] Both parties state that the trial court imposed a court operations assessment of $40 and a court facilities assessment of $30, based on the minute order from the sentencing hearing. The court orally imposed assessments of $80 and $50 respectively, however, and "[t]he record of the oral pronouncement of the court controls over the clerk's minute order." (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2.)

[5] The issue whether a trial court is required to consider a defendant's ability to pay before imposing or executing these and other monetary charges is currently pending before our state Supreme Court. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

exactions exceed [the defendant's] ability to pay." (*Cowan*, *supra*, 47 Cal.App.5th at p. 34, review granted.) Although *Cowan* "reach[ed] a result similar to that in *Dueñas*," it did so based on "the excessive fines prohibition in the Eighth Amendment and its counterpart under the California Constitution, article I, section 17," not the "synthesis of due process and equal protection principles" that *Dueñas* used. (*Cowan*, at pp. 35, 42, 38.)

Appellate courts have disagreed about whether defendants who did not object to these monetary charges on ability-to-pay grounds before *Dueñas* forfeited the issue. " '[R]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 92.) In such situations, " ' " 'to require defense counsel to raise an objection "would place an unreasonable burden on defendants to anticipate unforeseen changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule . . . would be changed on appeal." ' " ' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1215.) Applying these principles, some courts took the view that nothing prevented defendants from making the same objection the *Dueñas* defendant did and found claims under that decision forfeited. (E.g., *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154.) Other courts concluded that defendants could not have reasonably anticipated *Dueñas* and considered such claims on the merits. (E.g., *People v. Jones* (2019) 36 Cal.App.5th 1028, 1033.)

Similarly, Hamilton argues that he did not forfeit his claim because he could not have foreseen *Cowan*, which was decided the month after he was sentenced. He claims that even though *Dueñas* was decided well before his sentencing, "he should not be barred from relief under *Cowan*" because

13

*Cowan*'s analysis was "distinct" from that in *Dueñas*. But *Dueñas* and *Cowan* both held that a defendant has a right to an ability-to-pay hearing before the same fines and fees as those at issue here are imposed. Hamilton does not persuasively explain why the different constitutional bases for the two decisions should forgive his failure to argue that he lacked the ability to pay the charges. We recognize that other decisions have disagreed with *Dueñas*, but the unsettled nature of the law in this area does not establish that an ability-to-pay objection would have been futile or wholly unsupported at the time Hamilton was sentenced. (See *People v. Brooks*, *supra*, 3 Cal.5th at p. 92; see also *Dueñas*, *supra*, 30 Cal.App.5th at p. 1171, fn. 8 [indicating that due process and excessive fines analyses are essentially the same].) In short, he offers no persuasive reason why he should not have been expected to object on ability-to-pay grounds below, and we conclude that his claim is forfeited.

Finally, we address an error in the amount of the court facilities assessment and order the abstract of judgment corrected. The court facilities assessment, also known as the criminal conviction assessment, must be imposed in the amount of $30 for every misdemeanor or felony conviction. (Gov. Code, § 70373, subd. (a).) Hamilton was convicted of two offenses, so the fee should have been $60, not $50. Therefore, we order it corrected to $60. (See *People v. Rodriguez* (2021) 66 Cal.App.5th 749, 775 [purely legal sentencing errors may be corrected on appeal].) In turn, the abstract of judgment must be modified to reflect that amount, as well as to reflect that the court operations assessment actually (and correctly) imposed was $80, not $40. (See § 1465.8, subd. (a)(1) [$40 fee per conviction].)

## III.
### DISPOSITION

The judgment is modified to impose a court facilities assessment of $60 under Government Code section 70373. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment reflecting (1) the correct amount of the court facilities assessment, $60; (2) the $80 court operations assessment under Penal Code section 1465.8; and (3) the concurrent one-year term for the arming enhancement under Penal Code section 12022, subdivision (a)(1), on count two. The court is also directed to send a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

HUMES, P. J.

WE CONCUR:

MARGULIES, J.

BANKE, J.

A160012
*People v. Hamilton*