Filed 8/26/22 In re C.C. CA3
Opinion following rehearing

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| In re C.C., a Person Coming Under the Juvenile Court Law. | C087924 |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C.C.,<br><br>Defendant and Appellant. | (Super. Ct. No. 52008590)<br><br>OPINION AFTER GRANT OF REHEARING |

This is a new opinion in this case, issued after we granted rehearing at the Attorney General's request. We now come to a different conclusion than that reached by a different panel of this court in its May 17, 2022, opinion. We hold sufficient evidence supports the threats charge and affirm the judgment as to that count. As we did in our previous opinion, we reverse the juvenile court's true finding on the unauthorized access to a computer count. As modified, we affirm the judgment.

1

## BACKGROUND

Appellant C.C. was adjudged a ward of the court under Welfare and Institutions Code section 602 after the juvenile court sustained a petition alleging that C.C. attempted to criminally threaten G.O., a classmate with whom he repeatedly talked about carrying out a school shooting, and that he unlawfully accessed a school computer to search "school shooting simulator." The court placed him on probation with various terms and conditions.

On appeal, C.C. contends the juvenile court's true finding that he committed an attempted criminal threat must be reversed because his speech and conduct was protected by the First Amendment to the federal Constitution and because insufficient evidence supports the finding. He also argues insufficient evidence supports the true finding that he committed unauthorized access to a computer. We agree as to the last point.

## FACTS

G.O. testified at the contested jurisdictional hearing that in early 2018 she and C.C. attended the same high school. They were not friends, but over a two week period they sat next to each other during English class. During that two week period, C.C. talked about guns and school shootings with G.O. "every single day that [she] sat next to him." He told G.O. he had access to a gun at home. Sometimes, C.C. "would . . . get his backpack and pretend like he was going to pull something out" and throw it at G.O., then he would "look at . . . other kids in the class and pretend . . . he was shooting a gun." C.C. did this "randomly during class when he would be talking about it," and every time he did it, he scared G.O.

C.C. showed G.O. a list he made entitled "to do list" (list) with names of people he wanted to shoot. G.O. was not on the list and she was not sure C.C. was serious about it, but she was "kind of scared" by it. C.C.'s list included multiple students and his English and math teachers, as well as an assistant school principal; next to that name was the notation, "Shoot him unrecognizable."

2

Although initially G.O. thought C.C. may have been joking, as he continued to talk to her about bringing a gun to school and shooting people, she became scared. On two occasions, C.C. told G.O. not to come to school because he intended to bring a gun and shoot up their shared English class. This "really scared" G.O. She worried about English class every day; she worried C.C. would hurt her. She was afraid each time he walked in the classroom and sat down next to her.

C.C. also talked about guns in general, learning to shoot guns, and shooting students while in other classes as well. During his math class, he sat next to I.F. and described ways to orchestrate a school shooting. He talked about calling and making a threat to the school to get everyone into the cafeteria; he said once the students were assembled in the cafeteria, he would shoot as many people as possible.

I.F. testified that she saw C.C. make a list of people he did not like and he asked her to do the same. She thought he wanted to hurt the faculty and students on his list.

B.L. was also involved in the conversation with C.C. and I.F. during math class about making lists of people they did not like. While making her list, B.L. asked C.C. if he was going to fight the people on the list and he responded, "no, no, no, petty thing fighting." Next to one student's name on B.L.'s list C.C. wrote "refuse to kill"; she assumed he meant that he would not kill that particular girl. A school administrator testified that B.L. told her C.C. discussed wanting to get a gun for a school shooting.

On March 20, 2018, C.C. was in math class; while walking around the room monitoring the students, C.C.'s math teacher saw that C.C. was not on the designated math page. After C.C. denied he was on a different website, the teacher confiscated C.C.'s school laptop, checked his search history, and discovered C.C. had conducted a Google search for "school shooting simulator." The school resource officer discovered C.C.'s list, together with B.L.'s list of people she hated, and another note C.C. had written that said, "Bye [*sic*] the time you find this it's to [*sic*] late" in his backpack. C.C. told the resource officer he was joking and had no intent to commit a school shooting.

3

C.C.'s math teacher was very concerned about the search for a "school shooting simulator" given recent school shootings and the fact that the teacher's name was on C.C.'s list; on a previous occasion he had found C.C. searching for guns on his school computer. The teacher suffered stress-related medical issues, and was afraid for the safety of his students, himself, and his family.

The assistant school principal was also afraid after learning he was on C.C.'s list with the directive "shoot him unrecognizable"; he was in charge of school discipline and had dealt with C.C. on multiple occasions. He believed it was possible C.C. would carry out a school shooting and was even more afraid after learning that firearms were found in C.C.'s home after his arrest.

C.C.'s mother testified on his behalf. She conceded that five unsecured firearms were found in their home but claimed only three were operative. According to his mother, C.C. was unaware that the firearms were in the house on the day of his arrest.

Following the jurisdictional hearing, the juvenile court found both counts of the petition true, with the true finding regarding the attempted criminal threat count specific to G.O. At a subsequent dispositional hearing, C.C. was placed on probation. He timely appealed.

A divided panel of this court initially concluded there was not sufficient evidence to support the juvenile court's true findings as to either charge. (*People v. C.C.* (May 17, 2022, C087924) [nonpub. opn.].) The dissent opined sufficient evidence supported the threats charge. A different divided panel of this court granted the Attorney General's petition for rehearing on June 6, 2022, and invited the parties to submit filings addressing the evidence supporting the true finding as to the criminal threats charge. The panel as presently constituted was assigned to this case on July 8, 2022. We now conclude sufficient evidence supports the threats charge.

4

## DISCUSSION

### I

### *First Amendment*

C.C. first contends his words and conduct were protected by the First Amendment to the United States Constitution, and as such were not subject to criminal sanctions. His claim has been forfeited because the issue was not raised in juvenile court and thus has not been preserved for review. As the Attorney General notes, " 'a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " (*United States v. Olano* (1993) 507 U.S. 725, 731.) We decline to consider this forfeited claim.

### II

### *Attempted Criminal Threat*

C.C. next contends that there is insufficient evidence to show he attempted to criminally threaten G.O. (Pen. Code, § 422, subd. (a).)[1] We disagree.

A. *Legal Principles*

When the sufficiency of the evidence is challenged on appeal, we apply the familiar substantial evidence rule. " '[W]e review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) " 'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)

---

[1] Further undesignated statutory references are to the Penal Code.

"We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) " 'If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Kaufman* (2017) 17 Cal.App.5th 370, 381.) A reversal for insufficient evidence is unwarranted " 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the adjudication]." ' " (*People v. Cravens, supra,* 53 Cal.4th at p. 508.)

A person may be found guilty of attempted criminal threat "whenever, acting with the specific intent to commit the offense of criminal threat, the [person] performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action." (*People v. Toledo* (2001) 26 Cal.4th 221, 230 (*Toledo*).) To prove the offense of criminal threat[2] the prosecutor must establish: (1) that the defendant willfully threatened to commit a crime which if committed would result in death or great bodily injury; (2) he made the threat with the specific intent that the statement be taken as a threat, regardless of whether he actually intended to carry out the threat; (3) the threatening statement, on its face and under the circumstances in which it was made, was so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of

---

[2] Section 422 provides in relevant part: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison." (§ 422, subd. (a).)

purpose and an immediate prospect of execution of the threat; and (4) the threatening statement caused the other person reasonably to be in sustained fear for their own safety. (§ 422, subd. (a); *Toledo*, at pp. 227-228.)

For purposes of an attempted criminal threat offense, a person acts with the specific intent to commit the offense of criminal threat "only if he or she specifically intends to threaten to commit a crime resulting in death or great bodily injury with the further intent that the threat be taken as a threat, under circumstances sufficient to convey to the person threatened a gravity of purpose and an immediate prospect of execution so as to reasonably cause the person to be in sustained fear for his or her own safety or for his or her family's safety." (*Toledo, supra,* 26 Cal.4th at pp. 230-231.) The attempt crime "requires not only proof of a subjective intent to threaten but also proof that the intended threat under the circumstances was sufficient to cause a reasonable person to be in sustained fear." (*People v. Chandler* (2014) 60 Cal.4th 508, 511.)

B. *Analysis*

C.C. first contends his statements and gestures did not convey the requisite gravity of purpose. We disagree. Although C.C. cites the lack of animosity or conflict between him and G.O. to support his argument, the presence of these factors is not necessary to show gravity of purpose. " 'The use of the word "so" [in § 422] indicates that unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.' " (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1538.) " 'The four qualities are simply the factors to be considered in determining whether a threat, considered together with its surrounding circumstances, conveys those impressions to the victim.' " (*Ibid.*)

Here, viewing the evidence in the light most favorable to the judgment, a reasonable trier of fact could find, based on all the surrounding circumstances, that C.C.'s statements and actions (including pretending to handle a gun and showing off his "list")

7

demonstrated the requisite unequivocality, unconditionality, immediacy and specificity so as to convey to G.O. a gravity of purpose and immediate prospect of death or great bodily injury. C.C. told G.O. twice in a 10-day period that he was going to shoot up their *shared* English class, and said he had a gun at home to carry out the attack. He put their English teacher's name on his list of people he wanted to shoot and showed it to G.O. while repeatedly talking about guns and school shootings. C.C. also made gun gestures with his hands, pretended to shoot his classmates, and pretended to take something out of his backpack--impliedly a gun--and throw his hands in G.O.'s direction, all while seated next to her. These words and actions contributed to the gravity of purpose C.C.'s speech and conduct conveyed to G.O.; this evidence was sufficient to make the requisite showing. (See *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1348 [the defendant's proximity to the victim and his threatening gesture of displaying a weapon added weight to his words].)

C.C. next argues his statements and actions were neither sufficient to cause G.O. reasonable sustained fear nor sufficiently probative of C.C.'s intent to cause such fear. His arguments fail to persuade. The primary communications to G.O. supporting the threats charge were the threats to shoot up their shared English class. As a member of that class who sat next to C.C. daily, G.O. was frightened by the threats and victimized by the statements. The juvenile court could reasonably find C.C. intended to instill fear in G.O. by threatening to shoot up their shared, daily class, pantomiming shooting some of the students in the class--not all of whom were on his list--with his hands, and pretending to pull something out of his backpack and throw it at G.O. Having seen him pretend to shoot the other students, and not knowing what he was pulling from his backpack, G.O. could reasonably fear he was pulling out a gun to shoot her as well as the others.

8

More specifically: G.O. testified she sat next to C.C. in English class for two weeks, that he would specifically reference that class, that he (twice) told her she should not come to school --not really a viable option for a high school freshman--because he was going to "bring a gun" and "shoot up the class," and that he discussed guns and school shootings with her "every single day that [she] sat next to him. She specifically discussed the fourth period English class where he sat next to her as the time period (two weeks) where she was "really scared" *and worried every day that he would hurt her.* She testified that "he would . . . get his backpack and pretend to pull something out" and he would "look at . . . other kids in the class and pretend . . . he was shooting a gun." This would happen "randomly during class when he would be talking about it." He also told her he had a gun at home. He was keeping her scared and anxious about what he would do, showing her a list and making gun gestures and pretending to pull out a gun while he was *next to her in the very class he said he would shoot up.* And these tactics worked--she was worried and scared.

When the entirety of the circumstances surrounding C.C.'s statements and conduct are considered, it is readily apparent the juvenile court could reasonably infer that C.C. specifically intended G.O. to take his statements about shootings and his list as threats, and that her resulting fear when she did just that was reasonable.

C.C. relies on our decision in *People v. Roles* (2020) 44 Cal.App.5th 935, to support his claim on appeal, but his reliance is misplaced. In *Roles*, the charged victim of the threats at issue *never heard the threats.* (*Id.* at pp. 943-944.) Here, C.C. spoke *directly to and with* the charged victim, G.O. In fact, he spoke to her, time after time, over a sustained period, as her fear escalated. Similarly distinguishable is *People v. Felix* (2001) 92 Cal.App.4th 905, another decision on which C.C. relies. In *Felix*, the defendant told his therapist that he intended to kill his ex-girlfriend as soon as he was released from custody and the therapist conveyed the threat to the victim. (*Id.* at p. 909.) The resulting issue was whether the defendant intended his therapist to communicate the

9

threat to his ex-girlfriend. (*Id.* at p. 913.) Again, here, C.C. repeatedly made his threats *directly to G.O.* while she continued to grow more afraid. *Roles and Felix* are not on point; communication to a third party is not an issue here.

To the extent C.C. argues G.O.'s fear was unreasonable because she was not on his list, this argument misses the mark. As we have detailed *ante*, C.C. specifically told G.O. that he would shoot up their English class, not all of whom were on the list, and he gestured as if he was contemplating doing just that. G.O.'s absence from the list does not indicate her fear of harm was unreasonable, and it is certainly not evidence that C.C. intended her no harm. Further, the fact that C.C. told G.O. not to come to school on two occasions because he was going to shoot up their English class may be interpreted as *either* an actual warning intended to protect G.O., or a feigned warning intended to scare her, is not dispositive. It is evident the juvenile court interpreted these communications as the latter and, under the governing standard of review, we must accept that interpretation. To the extent the circumstances of C.C.'s actions and words can be reconciled with a contrary finding, reversal is not warranted under the governing standard of review. (*People v. Kaufman, supra*, 17 Cal.App.5th at pp. 380-381.)

The juvenile court's implicit finding that C.C. specifically intended to threaten G.O. is further supported when C.C.'s statements and conduct are considered against the wider backdrop of recent school shootings, of which C.C. and G.O. were likely aware. (See *In re George T.* (2004) 33 Cal.4th 620, 640 (conc. opn. of Baxter, J.) ["[i]t is safe to say that fears arising from a raft of high school shooting rampages . . . are prevalent among American high school students"].) In fact, the student shooting in Parkland, Florida, that killed 17 people occurred in February 2018--during the precise time span covered by the petition for the attempted criminal threat offense. (See History.com Editors, *Teen gunman kills 17, injures 17 at Parkland, Florida high school* <https://www.history.com/this-day-in-history/parkland-marjory-stoneman-douglas-

10

school-shooting> [as of February 11, 2022], archived at < https://perma.cc/3TNM-V5CT>.)

G.O. testified that she was "really scared "for a "couple of weeks" based on C.C.'s conduct *toward her* and his repeated statements *to her* (as opposed to, as in *Roles* and *Felix,* conduct toward and statements to someone other than the charged victim). Such evidence was sufficient to show that C.C.'s actions created a sustained fear in G.O. that was certainly more than momentary, fleeting, or transitory. (*People v. Fierro, supra,* 180 Cal.App.4th at p. 1349 [" 'Sustained fear' refers to a state of mind" "it means a period of time that extends beyond what is momentary, fleeting or transitory."]) The evidence that C.C. talked with G.O. about wanting to shoot people in their English class *every day* for two weeks further supports a finding that he intended to put G.O. in a sustained state of fear, notwithstanding his argument to the contrary.

It is also clear that G.O.'s fear was reasonable under the circumstances. While it is true that some of her fellow students were not afraid, they were not subjected to C.C.'s talk about shooting up their class every day for two weeks while he pretended to shoot students and access weaponry. Moreover, both C.C.'s math teacher and school principal testified they were fearful of C.C.'s statements and conduct, and the assistant principal said he thought it was possible C.C. was capable of carrying out such an attack. Given the totality of the circumstances, including the reality of other school shootings, G.O.'s sustained fear was reasonable.

When viewed in the light most favorable to the judgment, the entire record contains substantial evidence from which the juvenile court could find beyond a reasonable doubt that C.C. attempted to criminally threaten G.O.

### III

#### *Unauthorized Access of Computer*

C.C. contends insufficient evidence shows he used the school computer without permission. We agree.

11

The juvenile court found C.C. guilty of computer access and fraud based on section 502, subdivision (c)(3), which defines a public offense where a person "[k]nowingly and without permission uses or causes to be used computer services." (§ 502, subd. (c)(3).) " 'Computer services' includes, but is not limited, to computer time, data processing, or storage functions, internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network." (§ 502, subd. (b)(4).)

While the statute does not define the phrase "without permission," some courts have found that "[i]individuals may only be subjected to liability for acting 'without permission' under Section 502 if they 'access[] or us[e] a computer, computer network, or website in a manner that overcomes technical or code-based barriers.' " (*In re Facebook Privacy Litigation* (N.D.Cal. 2011) 791 F.Supp.2d 705, 715; *NovelPoster v. Javitch Canfield Group* (N.D.Cal. 2014) 140 F.Supp.3d 938, 950 [same].) Because the record is devoid of any evidence showing C.C. overcame any technical or code-based barriers when he conducted a Google search for a "school shooting simulator" during his math class, he argues that the evidence was insufficient to prove he used the school's computer services without permission.

The Attorney General contends the phrase "without permission" should be interpreted more broadly than in *In re Facebook Privacy Litigation*, essentially arguing that whenever a student is authorized to use a school computer, but somehow violates an expected term of use--here, the math teacher's direction to access a math program rather than Google at that specific time--the student is acting "without permission" under section 502 and may be properly held criminally liable.

To resolve the dispute, we must apply basic rules of statutory construction. (*People v. Childs* (2013) 220 Cal.App.4th 1079, 1100-1101 [interpreting the language of § 502, subd. (c)(5)].) "The overriding goal of statutory construction is to ascertain the legislative intent behind the statute, in order to give effect to that intent." (*Id.* at p. 1101.)

12

Because the text of a statute is the best indicator of legislative intent, "we begin with the plain, commonsense meaning of the language that the Legislature used. If that language is unambiguous, then the plain meaning of the statute controls." (*Ibid*.) If, however, the statutory language is ambiguous and permits more than one reasonable interpretation, then we may resort to extrinsic sources, including the ostensible objects to be achieved or evils to be remedied, legislative history, and public policy. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272; *People v. Connor* (2004) 115 Cal.App.4th 669, 678.) "In such circumstances, we ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Day*, at p. 272.)

On its face, the term "without permission" is ambiguous; it could have more than one reasonable meaning. C.C. *did* have permission, as a student, to use the school computer during math class. But he did not have specific permission at the relevant time to use the computer for non-school-related activities. He exceeded the scope of his permission without breaching any barriers. We thus turn to extrinsic aids to determine whether the conduct at issue here falls within the scope of the statute.

Subdivision (a) of section 502 declares the Legislature's intent in enacting the statute; it was intended "to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." (§ 502, subd. (a).) According to the Legislature, "the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data." (*Ibid*.) Protecting the integrity of all types and forms of lawfully created computers, computer systems, and computer data, the Legislature declared, was vital to protect the privacy of individuals as well as the well-being of financial institutions, business concerns,

13

governmental agencies and others within the state that use these computers, computer systems, and data. (*Ibid.*)

The primary thrust of the statute is to deter and punish those who access a computer system without permission in order to obtain or alter the information contained therein. (See *People v. Gentry* (1991) 234 Cal.App.3d 131, 141, fn. 8.) Here, C.C. merely exceeded the scope of his permission, i.e. misused a computer that he was permitted to use to access and educational site, by accessing various websites through Google searches. While not directly on point, *Chrisman v. City of Los Angeles* (2007) 155 Cal.App.4th 29 is instructive. In *Chrisman*, a police officer used his work computer for non-duty-related inquiries, searching for celebrities, his girlfriend and her acquaintances, and himself. (*Id.* at pp. 32, 35-37.) The court found that the officer did not violate section 502, subdivision (c)(7), which prohibited a person from knowingly and without permission accessing or causing to be accessed any computer, computer system, or computer network. (*Chrisman*, at pp. 35-37.) Although *Chrisman* focused on the statutory definition of "access" rather than "without permission," the case demonstrates that merely exceeding the scope of an otherwise proper and permitted use is not what the Legislature sought to prohibit when it enacted section 502.

We also note that in the employment context, "the Legislature deemed some violations of subdivision (c)(3) to be so trivial or de minimis as not to warrant criminal treatment, namely computer use, though outside the scope of employment, that either does not injure the employer or does not use [$250] worth of supplies or services. Possible examples of this would be an employee who 'surfs' the Internet when he or she has been told not to, or, as the prosecutor suggested, an employee who plays a computer game." (*People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1442.)

We conclude insufficient evidence supports count 2 and reverse the true finding thereon.

14

## DISPOSITION

The true finding as to count 2 (§ 502, subd. (c)(3)) is reversed.  The judgment is otherwise affirmed.

                                                  /s/
                                            Duarte, J.

I concur:

  /s/
Hoch, J.

15

HULL, J., Concurring and Dissenting:

I concur in the majority opinion Parts I and III; as to Part II, I dissent.

The majority and I agree on two things, I think. First, as a society, and with justification, we are deeply troubled and saddened by the continuing incidents of shootings and mass murder at schools and other places undertaken in our recent history by young men. Second, the evidence in this matter strongly suggests that C.C., at the time of the actions described in the majority opinion, was a troubled teenager who earned the attention of school and other authorities and who required psychological counseling and other appropriate services.

Even so, the only question before us is whether the evidence presented during the trial of this matter was sufficient to establish that C.C. committed a crime, specifically that he attempted to criminally threaten G.O., a classmate, in violation of Penal Code section 422. (Statutory section citations that follow are to the Penal Code unless otherwise stated.)

Section 422 provides:

"Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

"In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will

1

result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation omitted.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228 (*Toledo*).)

"[T]here is a crime of attempted criminal threat in [California], defined through the interplay of section 422 and the statutory provisions relating to attempts. As we have seen, section 664, by its terms, provides that '[e]very person who attempts to commit *any* crime' (italics added) is subject to the criminal punishment set forth in that provision, and this language on its face thus includes those who attempt to commit the crime of criminal threat set forth in section 422.

"Under the provisions of section 21a, a defendant properly may be found guilty of attempted criminal threat whenever, acting with the specific intent to commit the offense of criminal threat, the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action. Furthermore, in view of the elements of the offense of criminal threat, a defendant acts with the specific intent to commit the offense of criminal threat only if he or she specifically intends to threaten to commit a crime resulting in death or great bodily injury with the further intent that the threat be taken as a threat, under circumstances sufficient to convey to the person threatened a gravity of purpose and an immediate prospect of execution so as to reasonably cause the

2

person to be in sustained fear for his or her own safety or for his or her family's safety." (*Toledo, supra,* 26 Cal 4th 221, 230-231.)

"[N]either the criminal threat statute (§ 422) nor the criminal attempt statutes (§§ 21a, 664) unambiguously indicate that an attempted criminal threat requires only a subjective intent to threaten, with no objective component. To avoid substantial First Amendment concerns associated with criminalizing speech, we construe the offense of attempted criminal threat to require proof that the defendant had a subjective intent to threaten and that the intended threat under the circumstances was sufficient to cause a reasonable person to be in sustained fear. Accordingly, when a defendant is charged with attempted criminal threat, the jury must be instructed that the offense requires not only that the defendant have an intent to threaten but also that the intended threat be sufficient under the circumstances to cause a reasonable person to be in sustained fear." (*People v. Chandler* (2014) 60 Cal.4th 508, 525; italics omitted.)

Thus, placed in context here given the evidence, to sustain the trial court's finding that C.C. attempted to criminally threaten G.O., the evidence must be sufficient to show that: (1) C.C. willfully threatened to commit a crime which would have resulted in the death or great bodily injury of G.O.; (2) that C.C. made the threat to G.O. with the specific intent that the statement to G.O. was to be taken by her as a threat to her; (3) C.C.'s threat to G.O. was on its face and under the circumstances in which it was made so unequivocal, unconditional, immediate and specific as to convey to G.O. a gravity of purpose and an immediate prospect of the execution of the threat to G.O.; (4) that the threat actually caused G.O. to be in sustained fear for her own safety; and (5) that G.O.'s fears were reasonable under the circumstances.

In addition, given the fact that C.C. was found guilty of an attempted criminal threat, the evidence must show that defendant not only have the specific intent to threaten G.O. but also that the intended threat be sufficient under the circumstances to cause a reasonable person to be in sustained fear.

3

The majority makes much of what C.C. did and threatened as it related to his fellow students and the school faculty. That was serious business. But the focus of our inquiry must look to his actions and statements to G.O. and her reaction to those matters because C.C. was found guilty of making an attempted criminal threat only to G.O. and not to others.

At trial, G.O. testified that at the time of the events that she described, she was a ninth grade student in high school. She was a student in an English class during two weeks of which she sat next to C.C. In pertinent part her testimony was as follows:

<u>Direct</u> <u>Examination</u>

"Q.     . . . When you sat next to each other in class, did you ever talk to [C.C.]?

"A.     Yeah, I did.

"Q.     Did you ever hear [C.C.] talking about guns?

"A.     Yes.

"Q.     What did he say?

"A.     He would say stuff like: 'What if I brought a gun to school and shot up the certain class like English [*sic*] and the teacher that was the teacher of that class?'

"Q.     Mr. (O.)?

"A.     Yeah, and he would tell me 'Don't come to school this day because I'm going to shoot up the class.' That's what he would say. [¶] . . . [¶]

"Q.     How often did he talk to you about guns and school shootings?

"A.     Every single day that I sat next to him.

"Q.     Were you friends outside of English?

"A.     Not really. Like I knew of him, but I wasn't friends with him.

"Q.     Had you had a conversation with him before you had him in your English class?

"A.     No.

4

"Q. How often did he tell you don't come to school on a specific day because he is going to shoot the class?

"A. He told me that like twice.

"Q. Did you ever see him with any sort of list?

"A. Yes, I did.

"Q. Would you tell me about that?

"A. He pulled out a list out of his backpack. It said 'to do list' on it. He told me those were the people that he wanted to shoot. [¶] . . . [¶]

"Q. I'm going to show you Exhibit 1 for identification. I'd ask that you look at it and then look up when you have had a chance to look at it. Do you recognize that document?

"A. Yeah.

"Q. How do you recognize it?

"A. He showed me. [¶] . . . [¶]

"Q. Did he say anything when he showed you the list?

"A. He just told - -I asked him what it was. He told me it was the list of people that he didn't like that had done him wrong or something and that he wanted to shoot.

"Q. Now, did you read the list and look at the names on the list at the time he showed you?

"A. Yeah.

"Q. How did that make you feel?

"A. Um, it kind of scared me, but I thought that he was like joking about it. I didn't think he was serious and yeah.

"Q. You said that he talked about specifically shooting up your English class?

"A. Yeah. [¶] . . . [¶]

"Q. . . . How did that make you feel?

"A. That really scared me actually.

5

"Q. And can you describe that a little bit more? Were you worried - -

"A. I was worried about that class. Like when he would walk in, he walked in the classroom and come [*sic*] sit by me because I'm right next to him.

"Q. What were you worried about?

"A. I was worried that he was going to hurt me.

"Q. How long do you think you were worried about that?

"A. A couple weeks. I'm going to say like two weeks.

"Q. You only sat next to him for a couple weeks?

"A. Yeah.

"Q. Is that when you were worried?

"A. Yes.

"Q. You said he talked to you about it every day that you saw him?

"A. Yes.

"Q. Is that every day for two weeks, like ten days in classes about?

"A. Yeah, about. [¶] . . . [¶]

"Q. Was there anything else about what he was doing or saying that worried you?

"A. Yeah, he would like get his backpack and pretend like he was going to pull something out and throw it towards me and would like scare me for just a minute.

"Q. Was that scary because of what he did or was it scary because [of] what he did plus the threats?

"A. Both.

"Q. So in addition to pretending to throw something at you, was anything else scary to you?

"A. He would look at like other kids in class and he would like do gun symbols. He would pretend like he was shooting a gun. [¶] . . . [¶]

"Q. When would he do that?

6

"A.   Just randomly during class when he would be talking about it.

"Q.   When he would be talking about what?

"A.   Bringing a gun and shooting certain people.

"Q.   Did he ever talk to you about actually having a gun?

"A.   He said that he owned one at home, that his family had one.

"Q.   Did he talk any more about having access in any way to guns?

"A.   Not really, only that he had one at home.  That's all he said.

"Q.   And over the two week period, were you scared the same on the first day as the last day or can you describe that?

"A.   I got more scared like when he would talk about it so much.  At first I was not scared because I thought he was kidding.  Then I started to get scared like at the end."

Cross Examination

"Q.   At some point [C.C.] stopped going to school with you, right?

"A.   Yes.

"Q.   Would that have been mid to late March?

"A.   I think so.

"Q.   Okay.  And today is not the first time you talked about this case, right?

"A.   No.

"Q.   On a previous occasion you spoke with an Officer [K.]?

"A.   Yeah.

"Q.   And that wasn't the day that [C.C.] stopped going to your school, right?

"A.   No, it wasn't.  [¶] . . . [¶]

"Q.   And it's true that you told him that you were kind of scared?

"A.   Yes.

"Q.   And it's true that you told him you had not reported anything that you told us today to any kind of teacher?

7

"A.     Yes.

"Q.     You hadn't reported it to any kind of staff member?

"A.     Yes.

"Q.     Okay. Today you testified about you remember [C.C.] having said something about having a gun at home or access to a gun, something to that effect, right?

"A.     Yeah.

"Q.     Is it true that you indicated that you believed he had said that he had access to a gun?

"A.     I know he said that.

"Q.     You know he said that?

"A.     Yeah.

"Q.     All right. You don't know for sure that he did, right?

"A.     He did. I remember clearly he said that.

"Q.     Maybe I'm not being clear. You testified that you are sure that he told you that about a gun at home.

"A.     Yes. Yes.

"Q.     You can't confirm for this Court that he had a gun at home, right?

"A.     No, I can't. [¶] . . . [¶]

"Q.     It's true you never told Officer [K.] anything about 'Don't come to school on this day because I'm going to shoot up the school'?

"A.     I didn't tell him that.

<u>Redirect Examination</u>

"Q.     [G.O.] who did you tell?

"A.     I told my mom and my sister.

"Q.     Why did you tell them?

"A.    Because I was kind of concerned about it.  And yeah, I didn't want to tell the teacher.  I don't know why.

"Q.    And was your – in your conversation with your mom, was your mom going to report it?

"A.    I don't think my mom was going to report it, but my sister said that she was.  [¶] . . . [¶]

"Q.    I wanted to ask you about [C.C.] telling you not to come to school on a certain day.  You said that happened about twice, is that right?

"A.    Yes.

"Q.    And did that topic come up with Officer [K.]?

"A.    No.

"Q.    And if he asked you about it, and you remembered – if you thought you were answering his question would you have told him.

"A.    Yes."

At this point, G.O. was excused as a witness and did not testify further.

The "to do" list to which G.O. testified did not have G.O.'s name on it.

I have set forth G.O.'s testimony at length as much for what she said as for what she did not say.  In my view, she testified truthfully and credibly.

It is important again to note that C.C. was not convicted of making criminal threats to members of the student body other than G.O. or to members of the faculty; he was found guilty only of making a criminal threat to G.O. and it is the evidence of that alleged threat that we are constrained to consider.

Returning to the elements of the crime of making a criminal threat, the most significant failure of the evidence is the requirement that the evidence show that C.C. specifically intended to threaten G.O.  I cannot find sufficient evidence that C.C. harbored that specific intent.

9

To the contrary, read objectively, the evidence not only failed to demonstrate beyond a reasonable doubt that C.C. intended to threaten G.O., if anything it demonstrated that he made an effort to assure her she was not one of those he might have been threatening.

Thus, C.C. told her he would tell her when not to come to school so she would remain safe. The "to do" list did not include G.O.'s name. There is no evidence that the hand gestures that he made as if he were shooting a gun were directed at G.O. G.O.'s testimony on this point was, "He would look at like *other kids* in class and he would like do gun symbols. He would pretend like he was shooting a gun." Tellingly, there was no evidence to show (and G.O. did not testify) that C.C. made his hand gesture toward her.

Further, G.O. testified that C.C. would talk about "Bringing a gun [to school] and shooting *certain people*." There is no evidence that the "certain people" he spoke of included G.O. and his words were self-limiting in that he was saying that he was only intending to shoot those people. G.O. was not one of them.

The evidence is wanting in other respects although perhaps not as compelling as the lack of evidence that C.C. held a specific intent to threaten G.O.

As noted earlier, to make out the crime of criminal threat it must be proven that the threat was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to" G.O. a gravity of purpose and an immediate prospect of execution of the threat. I can find no evidence that C.C. unequivocally, unconditionally, immediately threatened G.O. with a gravity of purpose and an immediate prospect of execution of a threat to her. One must wonder how making an unconfirmed claim to having access to a gun in one's home without more could amount to an "immediate" and "unequivocal" prospect of execution of a threat to G.O. given all of the circumstances here.

I do not take lightly the situation we have here where an apparently troubled young man talks of shooting and killing his school mates and members of his faculty.

10

Recent and tragic events have taught us without doubt that such talk and actions must be taken very seriously and addressed appropriately. We cannot afford to overlook such conduct.

But an appropriate response cannot include sustaining a criminal conviction that the evidence does not support. We must judge the law and the evidence as it is and, as it is here, the evidence is insufficient to prove beyond a reasonable doubt that C.C. specifically intended to criminally threaten G.O. thus violating section 422.

_____/s/_____

HULL, Acting P.J.

11